NATIONAL ASSOCIATION OF RE-
VERSIONARY PROPERTY
OWNERS, Petitioner,

v.

SURFACE TRANSPORTATION BOARD
and United States of America,
Respondents,

Association of American Railroads and
Rails to Trails Conservancy,
Intervenors.

No. 97–1516.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 1, 1998.

Decided Sept. 22, 1998.

Cynthia L. Amara argued the cause and filed the briefs for petitioner.

Evelyn G. Kitay, Attorney, Surface Transportation Board, argued the cause for respondents. With her on the brief were Henri F. Rush, General Counsel, and Martin W.

Matzen, Attorney, United States Department of Justice.

Louis P. Warchot and Kenneth P. Kolson were on the brief for intervenor Association of American Railroads.

Andrea Ferster and Charles H. Montange were on the brief for intervenor Rails to Trails Conservancy.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

WALD, Circuit Judge:

In 1996, the Surface Transportation Board ("STB" or "Board") issued a Notice of Proposed Rulemaking addressing the process by which railroad corridors are formally abandoned and may be opened to subsequent use as trails. The National Association of Reversionary Property Owners ("NARPO") submitted comments asking the STB to require that individual notice be provided abutting landowners of trail conversion proposals. The STB declined to provide for such notice in its Final Rule, and denied NARPO's petition for reconsideration. NARPO petitioned this court for review, claiming that such notice is required by the Due Process Clause of the Fifth Amendment. The STB and the United States moved to dismiss the petition as untimely, because the STB's predecessor, the Interstate Commerce Commission ("ICC"), had rejected individual notice in a previous rulemaking, and the rulemaking under review did not reopen that issue. We conclude that we are without jurisdiction to review NARPO's claim, and therefore grant the motion to dismiss.

1. The word "abandon" has a precise meaning in this regulatory scheme. An abandoned railroad corridor is one that is no longer used for rail service and is removed from the national transportation system. *See Preseault v. ICC*, 494 U.S. 1, 5–6 n. 3, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). A line that is no longer in use, but has not been officially abandoned, may be reactivated later and is termed "discontinued." *See id.*

2. The Board authorizes abandonment when it "finds that the present or future public convenience and necessity require or permit the abandonment...." 49 U.S.C. § 10903(d).

3. Section 1247(d) states in full:

## I. BACKGROUND

### A. *Statutory and Regulatory Framework*

■ Rail carriers acquire the right to use the land over which railroad cars travel in a variety of ways. Some land is obtained in fee simple, but often a railroad company holds a lesser interest in the land such as an easement or a fee simple determinable. *See National Wildlife Fed'n v. ICC*, 850 F.2d 694, 703 (D.C.Cir.1988). We refer to such a right to use the land as a right-of-way, and any underlying interest maintained by the grantor as a reversionary interest. In the beginning of the railroad era, state property law determined when a railroad company's right-of-way lapsed and the original grantor regained full ownership and control. Long ago, however, the federal government assumed a role in that process with passage of the Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 477–78. *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 319–20, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). A railroad may no longer abandon or discontinue use of a railroad corridor without the STB's approval.[1] *See* 49 U.S.C. § 10903(a)(1), (d); *National Wildlife Fed'n*, 850 F.2d at 704. When abandonment approval is given, however, federal regulatory jurisdiction ends.[2] At that point state property law returns to the foreground and controls the disposition of the land. *See id.*

The National Trails System Act Amendments of 1983 created the current version of the so-called "rails to trails" program. *See* Pub.L. No. 98–11, § 208, 97 Stat. 42, 48 (codified as amended at 16 U.S.C. § 1247(d)) ("Trails Act").[3] Under the program, railroad

The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 [45 U.S.C.A. § 801 et seq.], shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner

corridors otherwise ripe for abandonment may be converted to trails for recreational use. STB regulations govern the process of abandonment and trail conversion. As revised by the 1996 rulemaking under review here they provide for the following process.[4]

When a railroad wishes to abandon a corridor it files a Notice of Intent with the STB. *See* 49 C.F.R. § 1152.20(a)(1). The railroad must provide a copy of the Notice to significant users of the railroad, certain state entities including the governor, certain federal entities, Amtrak (if it uses the line), the Railroad Labor Executives' Association, and relevant railway labor organizations. *See* 49 C.F.R. § 1152.20(a)(2). The Notice must also be posted in relevant railroad stations and published in a newspaper once a week for three weeks in each affected county. *See* 49 C.F.R. § 1152.20(a)(3), (4). The Notice must include, *inter alia*, the beginning and ending railroad mileposts, the names of the stations affected, and the zip codes traversed. It must inform readers that "[a]ny interested person . . . may file with the Surface Transportation Board written comments concerning the proposed abandonment . . . or protests to it," that such comments must be filed within forty-five days of the application, that "the line may be suitable for other public use, including interim trail use,"[5] and that "[p]ersons opposing the proposed abandonment . . . that do wish to participate actively and fully in the process should file a protest." *See* 49 C.F.R. § 1152.21.

The railroad then files an application for abandonment with the Board fifteen to thirty days after the Notice of Intent. *See* 49 C.F.R. §§ 1152.20(b), 1152.24(a). The application must be served on some of the same state entities that receive the Notice of Intent and must be available for inspection at relevant railroad stations. *See* 49 C.F.R. § 1152.24(c).

Within twenty days the Board publishes notice of the application in the Federal Register. *See* 49 C.F.R. § 1152.24(e)(2). The Federal Register notice explains how anyone can file a comment or protest. *See* 49 C.F.R. § 1152.22(i).

If a state or local government, or a private entity, is interested in converting the railroad corridor to a trail, it must submit a trail use proposal within forty-five days of the filing of the abandonment application. *See* 49 C.F.R. § 1152.29(b)(1). Reflecting the statutory criteria of the Trails Act, proposals must include a statement of willingness to manage the corridor, assume liability, and pay taxes. *See* 49 C.F.R. § 1152.29(a).[6]

Within 110 days of the filing of the application, the Board determines whether the corridor qualifies for abandonment. *See* 49 C.F.R. § 1152.26(a). If abandonment conditions are met (and the line is not maintained pursuant to a subsidy or sale agreement under 49 C.F.R. § 1152.27, covering offers of financial assistance), the STB must determine whether any trail use proposals filed conform to § 1152.29(a). If not, the Board

consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

4. When a railroad seeks abandonment authorization under exemption procedures pursuant to 49 U.S.C. § 10502 (available when no local traffic

has run on the line in at least two years), the process is less involved in some respects from the one we describe. *See* 49 C.F.R. §§ 1152.50, 1152.60. The Trails Act rules of 49 C.F.R. § 1152.29 remain fully applicable. 49 C.F.R. § 1152.50(a)(2).

5. The use is deemed "interim" because the corridor may be returned to active railroad use in the future. *See Birt v. STB*, 90 F.3d 580, 583 (D.C.Cir.1996).

6. Offers of financial assistance and public use proposals may also be filed. *See* 49 U.S.C. §§ 10904, 10905; 49 C.F.R. §§ 1152.27, 1152.28. These involve alternative uses for rights-of-way and the opportunity for any person to avoid abandonment by subsidizing or purchasing the line. They are not at issue in this case.

authorizes the railroad to abandon the line.[7] If there is a qualifying trail use proposal, the railroad may decide whether to attempt to negotiate a trail use agreement with the prospective trail operator. *See* 49 C.F.R. § 1152.29(b)(1), (d)(1). If the railroad declines that option, abandonment is authorized. *See* 49 C.F.R. § 1152.29(b)(1)(ii). If negotiations prove unsuccessful, the railroad is authorized to abandon the line after 180 days. *See* 49 C.F.R. § 1152.29(c). If an agreement is reached the corridor becomes a trail and abandonment is not authorized.

In this way, the conversion from railroad to trail use blocks the abandonment of the corridor even though the conditions for abandonment are otherwise met. But for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger the extinguishment of rights-of-way and the vesting of reversionary interests. When such a reversion is blocked, the interim trail use has been deemed a taking, *see Preseault v. United States*, 100 F.3d 1525, 1550, 1552 (Fed.Cir.1996) (in banc), and the holder of a reversionary interest that does not vest because of a trail use may seek compensation in the United States Court of Federal Claims under 28 U.S.C. § 1491(a)(1) (the Tucker Act). *See Preseault v. ICC*, 494 U.S. 1, 4–5, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

## B. *Rulemaking Proceedings*

In 1986 the ICC adopted rules to implement the Trails Act. *See Rail Abandonments—Use of Rights–Of–Way as Trails (49 CFR Parts 1105 & 1152)*, 2 I.C.C.2d 591 (1986). The notice provisions did not (as they do not today) provide for individual notice to holders of reversionary interests of abandonment proceedings, or of the subset of abandonment proceedings involving interim trail use proposals.

Two years later, NARPO asked the ICC to consider whether several revisions should be made in the rules, including whether trail groups making rails to trails proposals should be required to give individualized notice to abutting landowners. NARPO's petition was granted and the 1986 rulemaking was reopened. *See Rail Abandonments— Use of Rights–of–Way as Trails—Supplemental Trails Act Procedures*, Ex Parte No. 274 (Sub–No. 13), 1988 ICC WL 224273, at *2 (May 23, 1988) ("we request comments on NARPO's suggestion that trail groups identify themselves to reversionary interest holders, and how this might be implemented"). One year later, however, the ICC decided not to change its original notice requirements in this respect. *See Rail Abandonments—Use of Rights–of–Way as Trails—Supplemental Trails Act Procedures*, Ex Parte No. 274 (Sub–No. 13), 1989 ICC WL 238631 (May 18, 1989). The ICC explained that NARPO's alleged notice deficiency was not a real problem because of already available notice mechanisms, "abundant local publicity about trail proposals," and frequent local public hearings, and that "any requirement to identify, locate and notify reversionary interest holders—individually or through a general published notice—would be a time-consuming, expensive and burdensome task." *Id.* at *5 & n. 7. Further, such individualized notice did not fit with "our limited role and responsibilities under the Trails Act" and "would be inconsistent with the purposes of the Trails Act, which is to encourage and facilitate the interim use as trails of railroad rights-of-way that might otherwise be abandoned." *Id.* at *4, *5. The Commission reiterated that reasoning in denying NARPO's petition for reconsideration.[8] *See Rail Abandonments—*

---

7. The railroad is given the option of abandoning the corridor, but is not required to do so. If the railroad exercises its authority, it must file a notice of consummation with the STB. 49 C.F.R. §§ 1152.29(e)(2), 1152.50(e). The line is then abandoned and federal jurisdiction over the corridor ends. If a notice of consummation is not filed within one year, abandonment authorization expires (unless there are legal or regulatory barriers to consummation) and the line cannot be abandoned without a new proceeding. 49 C.F.R. § 1152.29(e)(2).

8. In its denial of reconsideration the ICC also explained why the case of *Londoner v. City & County of Denver*, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), cited by NARPO, was inapposite. *See Rail Abandonments—Use of Rights–of–Way as Trails—Supplemental Trails Act Procedures*, Ex Parte No. 274 (Sub–No. 13), 1990 ICC WL 287321, at *2–*3 (Feb. 13, 1990).

*Use of Rights–of–Way as Trails—Supplemental Trails Act Procedures,* Ex Parte No. 274 (Sub–No. 13), 1990 ICC WL 287321 (Feb. 13, 1990). NARPO did not seek judicial review.

In 1994, NARPO again asked the ICC to require railroads or prospective trail operators to give individual notice to landowners along the railroad corridor. This time NARPO framed its request as a petition for a new rulemaking, not the reopening of a prior rulemaking. The ICC denied this petition as well. *See Rail Abandonments— Use of Rights–of–Way as Trails—Supplemental Trails Act Procedures,* Ex Parte No. 274 (Sub–No. 13), 1994 ICC WL 390552 (July 27, 1994). NARPO asked this court to set aside the denial. We explained that "an agency decision not to initiate rulemaking is accorded extraordinary deference" and is only reversed in a "rare and compelling case," *National Ass'n of Reversionary Property Owners v. ICC,* No. 94–1581, 70 F.3d 638, 1995 WL 687741, at \*3 (D.C.Cir. Nov. 3, 1995) (quotation marks and citations omitted), and concluded that NARPO did not present such a case. *Id.* at \*4.

The ICC was abolished effective January 1, 1996, and its railroad abandonment and interim trail use responsibilities passed to the STB. *See* ICC Termination Act of 1995, Pub.L. No. 104–88, §§ 101, 201, 317, 109 Stat. 803, 804, 933–34, 949 ("ICCTA"). The ICCTA made some changes to the abandonment application process, such as eliminating the processing timetable and requiring that offers of financial assistance be filed within four months of an abandonment application, *see* 49 U.S.C. § 10904(c), but no changes were made to the Trails Act procedures.

In order to implement the ICCTA's changes and to make other revisions to 49 C.F.R. pt. 1152 (governing abandonment and discontinuance, and encompassing the Trails Act regulations), the STB published a Notice of Proposed Rulemaking ("NPRM") on March 19, 1996. *Abandonment & Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. 10903,* 61 Fed.Reg. 11,174 (1996).[9] In its NPRM, the STB proposed to:

(1) modify the schedule for processing abandonment applications (among other changes, the NPRM proposed giving Federal Register notice earlier in the process),

(2) add NARPO and the Rails to Trails Conservancy ("RTC") to the list of entities that must be served with a Notice of Intent,

(3) add zip codes to the identifying information that railroads must provide,

(4) require railroads to provide draft Federal Register notices,

(5) relax the requirement for filing system diagram maps which identify lines that are, or may soon be, the subjects of abandonment applications,

(6) eliminate the summary application process, which allowed applicants anticipating no substantial or material opposition to omit certain information from its application,

(7) eliminate separate procedures for bankrupt railroads,

(8) add the notice of consummation filing requirement,

(9) stop issuing certificates when abandonment applications are granted and issue only decisions instead,

(10) modify the content requirements for abandonment applications,

(11) modify the financial assistance regulations,

(12) modify the method of making certain financial calculations in abandonment applications, and

(13) eliminate an appendix from its regulations.

*See id.* at 11,175–79.

NARPO filed comments asking the STB to require actual notice of interim trail use proposals to each owner of land along a line proposed for abandonment. Consistent with its previous decisions, the STB rejected NARPO's proposal. *See Abandonment and*

9. The NPRM also proposed conforming changes to its environmental rules in 49 C.F.R. pt. 1105.

*Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. 10903*, 61 Fed.Reg. 67,876, 67,877 (1996) ("Final Rule"). The STB repeated perfunctorily its previous responses to the same NARPO request, *i.e.*, that actual notice is not feasible or necessary, citing to those previous decisions. *Id.*[10]

NARPO then filed a petition for reconsideration, again asking the STB to require individualized notice. The STB again declined on the same grounds, *see Abandonment and Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. 10903*, Ex Parte No. 537, 1997 ICC WL 351419, at *1–2 (June 18, 1997), this time including a brief discussion of *Preseault v. ICC* and *Preseault v. United States*, explaining why neither case dictated a contrary result.[11] *See id.* at *2.

NARPO filed a petition for review with this court, claiming that the Fifth Amendment's Due Process Clause requires actual notice of trail use proposals to holders of reversionary interests because a rails to trails conversion sometimes causes a taking. The STB and the United States filed a motion to dismiss as untimely. RTC and the Association of American Railroads intervened in support of respondents.

## II. ANALYSIS

▇ After the ICC's denial of NARPO's petition for reconsideration of its individualized notice proposal in 1990, NARPO had sixty days to seek review in this court under the Hobbs Act. *See* 28 U.S.C. § 2344. It did not do so. NARPO argues that the 1996 STB rulemaking reopened the issue of individualized notice so that the sixty-day period runs anew from the most recent denial of that proposal. *See, e.g., Ohio v. U.S. EPA*,

838 F.2d 1325, 1328–29 (D.C.Cir.1988). Appellees and intervenors disagree that the issue was ever reopened in the 1996 rulemaking, so that the earlier denials remain intact and the time for requesting their review has consequently passed. Because the time constraints of § 2344 are jurisdictional, *see, e.g., United Transp. Union Illinois Legislative Bd. v. STB*, 132 F.3d 71, 75 (D.C.Cir.1998) ("*UTU*"), if NARPO's reopening theory does not apply, we are without jurisdiction to consider NARPO's due process claim.[12]

▇ The reopening doctrine is well established in this circuit, creating "an exception to statutory limits on the time for seeking review [of an agency decision]...." *Id.* at 75–76. Questions of its application arise in situations where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision. We have said that when the later proceeding explicitly or implicitly shows that the agency actually reconsidered the rule, the matter has been reopened and the time period for seeking judicial review begins anew. *See Public Citizen v. NRC*, 901 F.2d 147, 150 (D.C.Cir.1990). "[T]he general principle [is] that if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable." *Id.* (quoting *Association of American R.Rs. v. ICC*, 846 F.2d 1465, 1473 (D.C.Cir.1988)). To determine whether an agency reconsidered a previously decided matter, thus triggering the reopening doctrine, a court "must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency...." *Id.*

---

**10.** Because of NARPO and RTC's opposition to their inclusion on the list of entities receiving Notices of Intent that proposal was dropped. 61 Fed. Reg. at 67,877.

**11.** In the former case, the Supreme Court upheld the constitutionality of the Trails Act. *See Preseault*, 494 U.S. at 4–5, 110 S.Ct. 914. In the latter case, the Federal Circuit held that a conversion to interim trail use was a taking when the railroad originally obtained only an easement that did not encompass trail use. *See Preseault*, 100 F.3d at 1552.

**12.** Intervenor RTC raises an additional jurisdictional issue, questioning NARPO's standing. While an intervenor can only address issues raised by a party, *see, e.g., Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C.Cir.1990), this court may consider standing *sua sponte. See, e.g., Steffan v. Perry*, 41 F.3d 677, 697 n. 20 (D.C.Cir. 1994) (en banc). We find that NARPO's petition for review contains allegations sufficient to support standing even though, inexplicably, it did not repeat those allegations in its briefs.

■ There are several factors we have emphasized when deciding if a reopening has taken place. The language of the NPRM itself is one factor. *See id.* An explicit invitation to comment on a previously settled matter, even when not accompanied by a specific modification proposal, is usually sufficient to affect a reopening. *See Edison Elec. Inst. v. U.S. EPA,* 996 F.2d 326, 332 (D.C.Cir.1993).

■ Ambiguity in an NPRM may also tilt toward a finding that the issue has been reopened. In *Association of American R.Rs.,* 846 F.2d at 1473, we scrutinized the ICC's rulemaking notice on the question of what "rate of return" to use when weighing the subsidization of railroads. We asked whether the notice reopened the decision, made years earlier, to use a "real" rate of return when weighing railroad abandonment applications. *See id.* Because the rulemaking notice was ambiguous, and could fairly be read to "suggest[ ] that the search for harmony might lead to a rethinking of old positions," we found that the earlier decision was reopened. *Id.*

■ When an agency invites debate on some aspects of a broad subject, however, it does not automatically reopen all related aspects including those already decided. *National Mining Ass'n v. United States Dep't of Interior,* 70 F.3d 1345 (D.C.Cir.1995), involved a petition for rulemaking on which the Department of Interior sought comments asking the Department to repeal one old rule (the "NOV" rule) and to modify a second one. *See id.* at 1348. The NOV rule addressed the point at which the Department would issue a notice of violation to a mine operator not in compliance with the Surface Mining Control and Reclamation Act or a permit condition. *See id.* at 1347. Under the NOV rule, a notice would not be issued if a state took appropriate action within ten days of notification by the Department. *See id.* The second rule involved the standard used by the Department to assess a state response to notification of a violation. *Id.* at 1348. After inviting comment on the two issues by way of publishing the petition the Department declined to open a rulemaking on the NOV rule, noting that its repeal "had already been con-sidered in previous rulemakings." *Id.* The portion of the petition dealing with the standard for state responses was granted, however, and a rulemaking initiated on that subject alone. *Id.* The petitioner argued that, by publishing and seeking comments on the NOV repeal request, the Department implicitly reopened that issue, and its ultimate decision not to begin a rulemaking on the repeal of the NOV was appealable. *Id.* at 1351. This court disagreed, noting that "[t]he decision to publish a petition for rulemaking ... is not evidence of a reexamination of the policy at issue in the petition." *Id.* More importantly for present purposes, however, the petitioner had also argued strenuously that the two issues were inextricably linked, so that by conducting a rulemaking on the state response standard the Department implicitly reopened the NOV rule. *See id.* We again disagreed, explaining that anything less than a direct relationship between the two rules would be too lax a standard for triggering the reopening doctrine:

> We can scarcely imagine any rulemaking that does not impact at least several rules that are not explicitly at issue in the rulemaking. Permitting any affected rule to be reopened for purposes of judicial review by a rulemaking that does not directly concern that rule would stretch the notion of "final agency action" beyond recognition. . . .

*Id.*

■ We also consider an agency's response to comments filed by parties during a rulemaking in deciding if a prior rule has been reopened. *See Public Citizen,* 901 F.2d at 150. In *UTU,* a union sought review of a new STB requirement that parties submit certain documents on computer diskette, as well as "the STB's longstanding rules and policies regarding public access to transcripts and to pleadings and correspondence from docket files." *UTU,* 132 F.3d at 72. The agency's proposed rule concerning the diskettes on which it invited comments did not suggest changing the public access rules and policies or solicit comments on them. *See id.* at 76. In the union's comments filed during the rulemaking, however, it asked for im-

proved public access. *See id.* at 74. The STB, in its Final Rule and modified Final Rule, did reference and list its existing access mechanisms. *See id.* at 76. Because "the STB's discussion of its policies and rules regarding public access to transcripts, pleadings, and correspondence came only in response to the UTU's unsolicited comments, and . ... the Board merely reiterated its (and its predecessor's) longstanding policies," we held that the public access provisions had not been reopened and that the challenge was therefore untimely. *Id.* at 76. Our decision in *UTU* was in accord with our earlier statement that:

> [t]he "reopening" rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue. To so read *Ohio v. EPA* would undermine congressional efforts to secure prompt and final review of agency decisions.

*American Iron & Steel Inst. v. U.S. EPA,* 886 F.2d 390, 398 (D.C.Cir.1989); *see also National Mining Ass'n,* 70 F.3d at 1352 ("Of course, that a statement accompanies the denial of a petition for rulemaking is not, without much more, sufficient to trigger the reopener doctrine.").

In this case, NARPO contends that the STB's NPRM both explicitly and implicitly reopened the individual notice issue, and that the STB's responses to its comments and its petition for reconsideration demonstrate reconsideration on the merits by the agency.

To support that claim NARPO highlights several parts of the NPRM:

> [T]he Board is proposing to revise part 1152 to implement the changes brought about by the ICCTA and to streamline and update the regulations.
>
> We view the ICCTA as reform legislation. As a result, we are taking this opportunity to examine, reform and streamline the existing rules and process.
>
> We have also attempted to update the regulations to improve notice to the public and ensure ample opportunity for full pub-

lic participation early in our proceedings, which we believe will ultimately result in an expeditious resolution satisfactory to the interested parties.

> Because of the importance of proposing rules to implement the new law as soon as possible, we recognize that we may have overlooked some potential improvements or may have proposed to retain provisions or language that no longer serves a useful purpose. We therefore welcome public comments on these proposals, and on any other areas where changes might be made, to streamline our abandonment regulations further and to assist us in carrying out the will of the Congress in the most efficient manner possible.
>
> We view the notice as a critical step in meeting the new time frames applicable to the abandonment process, because the notice apprises the public of proposed abandonments and ensures that potential concerns are brought to light at an early stage in the process and addressed.

61 Fed.Reg. at 11,175–76. NARPO also points to three of the changes proposed by the STB—giving actual notice to NARPO and RTC, changing the timing of Federal Register notice, and adding zip codes to identifying information that railroads seeking abandonment authorization must provide. NARPO views the language quoted and the specific changes proposed as evidence that the STB laid open the entire subject of notice, including the previously resolved question of individual notice to reversionary interest holders.

We begin our assessment of NARPO's argument with some initial observations. First, we note that the NPRM included other more qualifying language than the invitational overtures NARPO cites. *See id.* at 11,175 ("we are not proposing major revisions at this time to our . .. Trails Act rules"). Second, we nonetheless acknowledge that parts of the NPRM when read in isolation do sound like a call for suggested changes. Third, we point out that the NPRM does not in any way mention the subject of individual notice to landowners.

**144**

More critically, though, we go on to consider the cited language in the NPRM in the "entire context of the rulemaking." *Public Citizen*, 901 F.2d at 150. Indeed, for our purposes it is the context here that makes all the difference; it shows why this NPRM, unlike the one at issue in *Association of American R.Rs.*, for instance, was not ultimately ambiguous.

NARPO argues that the STB's NPRM is comparable to the EPA's solicitation of comments on a proposed rule at issue in *Edison Electric Institute*, where we found that the invitation did act to reopen a prior rulemaking. The EPA had issued in 1986 a hazardous waste storage rule to implement § 3004(j) of the Resource Conservation and Recovery Act. *See Edison Elec. Inst.*, 996 F.2d at 329. In 1989 the EPA proposed another rule on hazardous waste, and explicitly asked for comments on an alternative interpretation of § 3004(j). *Id.* at 329–30. After the agency ultimately adhered to its original view, we found the reopening doctrine applicable. *See id.* at 332. In *Ohio v. U.S. EPA*, we also found that a 1985 rulemaking had reopened 1982 regulations. In that case the EPA republished the old rules in an NPRM as part of a new proposal. *See Ohio*, 838 F.2d at 1328. Although the EPA explicitly sought comments on the new provisions only, it discussed the operation of the older ones in "general policy terms" as part of its statement of basis and purpose and responded on the merits to a comment on the older rule. *Id.* at 1328–29. *Ohio* relied on *Montana v. Clark*, 749 F.2d 740 (D.C.Cir. 1984), which found that a 1981 proposal reopened a 1978 rule concerning reclamation fees collected from mine operators. The proposal "held out [the 1978 rule] as a proposed regulation, offered an explanation for its language, solicited comments on its substance, and responded to the comments in promulgating the regulation in its final form." *Id.* at 744. Unlike the proposals and requests for comments in *Edison, Ohio*, and *Montana*, the STB's NPRM in this case did not mention the settled subject of the earlier rulemaking—owner notice. The STB did not explicitly seek comments on the propriety of not affording individualized notice or on any alternative approach to dealing with rever-

sionary interest holders; in short, unlike *Edison, Ohio*, and *Montana*, it did not focus attention in any way on the settled notice provision.

The three specific proposals in the NPRM involving enhanced notice do not themselves in any way suggest or require a wholesale review of the STB's notice regime. The proposed change in timing of Federal Register notice was just that—a change in timing. Such a notice was already required, only at a different point in the process. The change was occasioned by the statutory changes made by the ICCTA to the abandonment process timetable. The second change—adding NARPO and RTC to the notification list—although not prompted by the ICCTA, represented only a modification of a technique currently used by the Board to promote awareness of abandonment applications; the STB already required a railroad proposing abandonment to serve certain entities with its Notice of Intent. *See* 49 C.F.R. § 1152.20(a)(2) (1996). Moreover, there is a qualitative as well as quantitative difference in kind in notifying known entities, such as NARPO and RTC, about a trail use proposal and giving notice to all individuals who hold reversionary interests in land abutting the railroad corridor, in terms of the ease of ascertaining the identities of such owners and assuring individualized communication with them. The third notice change—adding zip codes—is similarly only an easily accomplished modification to the already existing requirements of publication and notice to organizational entities. In sum, these three specific notice proposals involved incremental improvements to the methods previously adopted by the STB to notify potentially interested parties of abandonment applications. Like the state response standard involved in *National Mining Ass'n*, none of these three are inextricably bound up with the kind of owner-notice sought by NARPO; in truth, the connection between the proposed changes and the rule sought to be reopened is much weaker than the one asserted there. By making these notice proposals, the Board did not in any way signal its intent to revisit the distinct and settled subject of individualized notice to those with

reversionary interests. At most, the Board signaled a willingness to tinker with existing notification procedures, but not to adopt brand new and potentially much more complex and expensive ones.

Understanding the limited scope of these specific notice proposals in the NPRM aids in interpreting the expansive language quoted by NARPO more accurately. The references to "improv[ing] notice to the public" and "notice as a critical step" are most reasonably read simply as expressing the agency's motivation and rationale for the specific changes it proposed, not as altering the actual scope of the changes it would entertain. The Board proposed some relatively minor modifications to its rules on notice, and in so doing rhetorically observed the importance of notice in the abandonment and conversion process. We do not believe such observations conferred on NARPO a license to challenge a settled and wholly different decision just because it also involved some form of notice.

Nor do the references to the ICCTA in the NPRM suggest reopening. The ICCTA only affected the rails to trails program insofar as it made changes to the abandonment process. By eliminating the statutory abandonment processing schedule and requiring that offers of financial assistance be filed within four months of an application, Congress necessitated the promulgation of a new schedule. As the Board explained in the NPRM, the ICCTA "generally preserve[d] requirements for public notice and the opportunity for public participation in development of a record upon which abandonment ... applications will be decided." 61 Fed.Reg. at 11,-175. Thus, in announcing a rulemaking to render the abandonment regulations consistent with the new statute, the STB was not pointing up a need or intention to revisit the question of actual notice to reversionary interest holders. The new law did not change the notice requirements in such a way that the STB could not avoid reconsidering the actual notice issue.

At bottom NARPO's strongest support comes from a sentence it quotes from the background section in the NPRM: "We ... welcome public comments on these proposals, and on any other areas where changes might be made, to streamline our abandonment regulations...." *Id.* Liberal though that language may be, we cannot construe the reopener doctrine to mean that the Board, by that one sentence, threw the rulemaking open to any possible changes that any member of the public might conjure up with the result that summary denial of such changes becomes reviewable by the courts. Agencies that do not intend to reopen an old rule might do well to use less hospitable language in their NPRMs, but, on balance, we consider such a diffuse invitation to be more akin to "Y'all come and see me" than to a formal invitation to join in the proceeding. Inserting what amounts to a suggestion box in the Federal Register hardly eviscerates jurisdictional time constraints.

We also find less significance than NARPO in words like "revise," "streamline," "update," "examine," and "reform." These words, used primarily in the supplementary and background sections of the NPRM, must also take their meaning from their context. The context, as we have explained, was one of making incremental adjustments to existing regulations and updating in light of a statute that did not call the STB's notice provisions into question. The use of these words, therefore, does not indicate that the Board was soliciting comments on the settled issue raised by NARPO.

NARPO also directs us to the agency's responses to its comments, arguing that even if the invitation was not ambiguous the responses reflect a genuine reconsideration by the agency of whether to provide actual notice to reversionary interest holders. We think not. In the Final Rule, the Board did note that some parties had asked for individualized notice, but in dispensing with the request offered in two paragraphs basically the same rationale given in 1989 (concluding the rulemaking on the question), 1990 (denying NARPO's request to reconsider the 1989 decision), and 1994 (denying NARPO's petition for a rulemaking on the subject). The mere act of repeating old reasons for an old policy in response to unsolicited comments is not the equivalent of reconsidering, and therefore reopening, the old issue. *See*

*UTU,* 132 F.3d at 76; *Brotherhood of Ry. Carmen v. Pena,* 64 F.3d 702, 705–06 (D.C.Cir.1995). The STB did precisely·the same thing in responding to NARPO's 1997 request for reconsideration, adding only a brief explanation of why two cases did not require a different result. Needless to say, simply noting that a longstanding policy is not in conflict with two recent cases in response to an unsolicited comment is not enough to reopen the policy itself.

### III. CONCLUSION

We find that the STB did not reopen the question of individualized notice to landowners abutting the railroad corridor which its predecessor, the ICC, had addressed in an earlier rulemaking. Accordingly, because NARPO's petition for review was not filed within sixty days of the earlier decision, we have no jurisdiction to consider it. The motion to dismiss is granted.

*So ordered.*