McMILLAN PARK COMMITTEE, Tony Norman, and Arthur Kinkead

v.

NATIONAL CAPITAL PLANNING COMMISSION; Sharon Pratt Kelly, Mayor of the District of Columbia; and Ric Murphy, Director of the Department of Administrative Services of the District of Columbia, Appellants.

Nos. 91–5134, 91–5135, 91–5143 and 91–5166.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 1992.

Decided July 7, 1992.

Jacques B. Gelin, Atty., Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., John C. Cleary, Asst. U.S. Atty., and Martin W. Matzen, Atty., Dept. of Justice, Washington, D.C., were on the brief, for federal appellants.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Office of the Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants Sharon Pratt Kelly, et al.

Katherine A. Meyer, Washington, D.C., for appellees McMillan Park Committee, Tony Norman and Arthur Kinkead in Nos. 91–5134 and 91–5166.

Andrea C. Ferster, with whom David A. Doheny and Elizabeth S. Merritt, Washington, D.C., for National Trust for Historic Preservation in the U.S., and Lovida H. Coleman, Jr., for the D.C. Preservation League, were on the joint brief, for appellees in Nos. 91–5135 and 91–5143.

Before EDWARDS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge RANDOLPH.

SENTELLE, Circuit Judge:

The National Capital Planning Commission ("Planning Commission") and the District of Columbia government ("D.C." or "the District") appeal from a District Court order involving the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 to 470w–6. Finding that the Planning Commission violated the NHPA when it reviewed an amendment to the Comprehensive Plan for the National Capital that would allow commercial development of McMillan Park, the District Court issued an injunction prohibiting implementation of the amendment. Because we conclude on the facts of this case that the Planning Commission did not engage in an "undertaking," as that term is defined in regulations implementing the NHPA, we hold that the Planning Commission did not violate the NHPA and we therefore reverse.

BACKGROUND

I. *Statutory Backdrop*

A. The National Historic Preservation Act

As explained in *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C.Cir.1989), the NHPA is "aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." Section 106 of the NHPA, 16 U.S.C. § 470f, accomplishes this by requiring federal agencies to consult with the Advisory Council on Historic Preservation ("Advisory Council") prior to taking an action that may affect a site "included in or eligible for inclusion in the National Register." In full, § 106 provides:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted *undertaking* in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the

undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under section 470i to 470v of this title a reasonable opportunity to comment with regard to such *undertaking*.

16 U.S.C. § 470f (emphasis added).

Agencies thus incur an obligation to comply with the NHPA when they engage in an "undertaking." *See id.; Lee*, 877 F.2d at 1056 ("[The] NHPA imposes obligations only when a project is undertaken either by a federal agency or through the auspices of agency funding or approval."). The NHPA itself provides scant guidance for determining whether an undertaking has occurred,[1] but the Advisory Council, in its implementing regulations, 36 C.F.R. Part 800, furnishes a detailed definition:

> *Undertaking* means any project, activity, or program that can result in changes in the character or use of historic properties, if any such historic properties are located in the area of potential effects. The project, activity, or program must be under the direct or indirect jurisdiction of a Federal agency or licensed or assisted by a Federal agency. Undertakings include new and continuing projects, activities, or programs and any of their elements not previously considered under section 106.

36 C.F.R. § 800.2(*o*).

Once triggered, an agency must satisfy a number of consultation and review procedures, known as the § 106 process, which require it to work with state historic preservation officers and the Advisory Council in tailoring proposed undertakings so that, to the extent possible, they do not harm historic properties. *See* 36 C.F.R. §§ 800.3 to 800.5 (describing regulatory steps involved in the § 106 process).

## B. The National Capital Planning Act

The National Capital Planning Act ("Planning Act"), 40 U.S.C. §§ 71–74, empowers the National Capital Planning Commission ("Planning Commission") "to preserve the important historical and natural features" of the federal city. 40 U.S.C. § 71a(a)(1). Much of the Planning Commission's duties center on the comprehensive plan for the National Capital, which it prepares and updates in conjunction with the D.C. government. 40 U.S.C. § 71c. First promulgated by the Planning Commission and the D.C. government in 1983, the comprehensive plan consists of federal and local elements, serves as a blueprint for future city development, and identifies federal interests that developers must accommodate. Planning Commission Comprehensive Plan for the National Capital, Parks, Open Space and Natural Features 2 (hereinafter "Comprehensive Plan"), *reprinted in* Joint Appendix ("J.A.") 105–117.

The D.C. government, through action by the Mayor and City Council, may adopt proposed amendments to the comprehensive plan and then submit them to the Planning Commission "for review and comment with regard to the impact of such ... amendment on the interests or functions of the Federal Establishment in the National Capital." 40 U.S.C. § 71a(a)(3). Upon receipt of an amendment, the Planning Commission "shall, within sixty days ..., certify to the [City] Council whether such ... amendment has a negative impact on the interests or functions of the Federal Establishment in the National Capital." *Id.* § 71a(a)(4)(A). Should the Planning Commission fail to act within the sixty-day time limit, such "amendment shall be deemed to have no such negative impact and ... shall be incorporated into the comprehensive plan [for the National Capital] and it shall be implemented." 40 U.S.C. § 71a(a)(4)(C). Finally, if the Planning Commission makes a finding of negative impact, the D.C. government may suggest modifications to the amendment; however, the Planning

---

**1.** The definition section of the NHPA, 16 U.S.C. § 470w, reads:

"'Undertaking' means any action as described in section 470f of this title." 16 U.S.C. § 470w(7).

Commission retains the power to veto any amendment to the comprehensive plan that it finds will result in a negative impact. *Id.* § 71a(a)(4)(B)–(C).

## II. *Factual Background*

McMillan Park lies in the northern part of the District of Columbia adjacent to North Capitol Street. Until the mid–1980's, the Army Corps of Engineers owned the site, which accommodated a massive slow sand drinking water filtration system dating from the early days of this century. In 1991, the D.C. Historic Preservation Review Board designated McMillan Park a Historic Landmark and nominated the site for the National Register of Historic Places.

During the Corps of Engineers's ownership, no commercial development of the Park occurred, and public access to the Park had been restricted since World War II when the Army erected a fence to guard against sabotage of the city's water supply. When the Planning Commission prepared the federal element of the first Comprehensive Plan in 1983, it included McMillan Park as among the "Parks, Open Space and Natural Features" of the city that "should be conserved and whose essential Open Space Character [be] maintained." Comprehensive Plan 33, *reprinted in* J.A. 116. The Park's future became uncertain, though, in 1986 when the Corps of Engineers declared the property surplus and asked the General Services Administration ("GSA") to dispose of it.

As the GSA searched for prospective buyers, the Planning Commission urged "the continuation of the open space ambiance that currently exists and the continuation of the treatment of this site as a Special Place." Planning Commission Report to the General Services Administration, NCPC File No. 0841, at 3 (May 1, 1986), *reprinted in* J.A. 121, 123. While not disagreeing with this goal, the GSA iterated its position that open space was not the highest and best use of the property, and insisted on selling the property for mixed commercial development. The D.C. government first expressed interest in the Park in June of 1986, and agreed to purchase the Park for mixed commercial/public use. Letter from William B. Johnson, Director, D.C. Dep't of Administrative Services, to B.C. Maltby, GSA (Sept. 23, 1986) ("Johnson Letter"), *reprinted in* J.A. 129.

At this point, the Advisory Council expressed "serious concerns" about the transfer and chastised GSA for not engaging in the NHPA § 106 process to determine if the site contained any historic or cultural resources. To satisfy these concerns, GSA agreed to include in the Deed of Sale to the District eight restrictive covenants suggested by the Advisory Council. The covenants did not prevent the District from using the Park for commercial development, but required it to submit all development plans to the D.C. Historic Preservation Officer for approval. If approval could not be obtained, then the District must "immediately request the comments of the [Advisory] Council in accordance with 36 C.F.R. 800." Brief for Federal Appellants at 12; *see also* Offer to Purchase Real Estate and Acceptance ¶ 3.11, *reprinted in* J.A. 142, 145.

The Advisory Council thereupon issued a letter to GSA stating that, based on inclusion of the restrictive covenants, "the requirements of Section 106 of the National Historic Preservation Act and the Council's regulations have been met for this project." Letter from Don L. Klima, Advisory Council, to Patricia Bailey, GSA (March 25, 1987), *reprinted in* J.A. 141. With the covenants in place and the Advisory Council satisfied that the GSA had complied with the NHPA, the District purchased McMillan Park for $9.3 million.

The District still could not develop the Park, however, unless the Comprehensive Plan was amended to permit commercial development. On December 21, 1989, the City Council enacted an amendment, among about 125 others, to the Plan that would place the Park in "the mixed use medium density residential, moderate density commercial, and parks, recreation, and open space land use category." D.C. Act 8–138, amendment 110 (Dec. 21, 1989), *reprinted in* J.A. 230, 231. The Park amend-

ment, along with the others, then went to the Planning Commission for its review as mandated by § 71a of the Planning Act.

At a meeting of the Planning Commission on February 22, 1990, to consider the amendments package, a representative of the Preservation Trust argued that the Planning Commission should not "approve" the amendment regarding McMillan Park until consulting with the Advisory Council under the § 106 process. The Planning Commission did not initiate the § 106 process, however, and moved forward with their review of the amendments. They did include within non-binding recommendations their "concern" about the Park and their objection "to the disposition of the site for private or semi-public development that would not maintain [the Park's] character as undeveloped open space." Planning Commission Executive Director's Recommendation, NCPC File Nos. CP19 & CP01/2028, at 9–10, *reprinted in* J.A. 247, 255–56. But the Planning Commission ultimately found that the Park amendment would not create a negative impact, and they so advised the D.C. Council.

In a letter dated March 22, 1990, the Advisory Council advised the Planning Commission that, "[f]rom our understanding of the case," the § 106 process applied to the Commission's "approval" of Comprehensive Plan amendments regarding McMillan Park. J.A. 339. The Planning Commission responded by asserting that it was not engaging in an "undertaking" because it simply reviews, not "approve[s]," Comprehensive Plan amendments. Letter from Reginald Griffith, Planning Commission, to John Fowler, Advisory Council 1 (Apr. 3, 1990), *reprinted in* J.A. 341. The letter also suggested that the restrictive covenants in the deed to McMillan Park "specifically anticipated land use changes," thereby making an additional § 106 review "superfluous." *Id.* at 341–42.

The next day, April 4, 1990, the Planning Commission transmitted to the D.C. Council its final certification that the Park amendment did not have a negative effect on the federal interest. As required by D.C.Code § 1–233(c), the City Council transmitted the amendments to Congress for its thirty-day review. After the review period expired without congressional objection, the amendments became effective in May 1990.

The McMillan Park Committee and the National Trust for Historic Preservation challenged the Park amendment in District Court, arguing that the Planning Commission's 40 U.S.C. § 71a review constituted an undertaking and triggered the § 106 process. Agreeing with the challengers, the District Court found that the Planning Commission did not observe procedures required by law, declared the Park amendment invalid, and enjoined all "actions taken in reliance upon it." *McMillan Park Comm. v. National Capital Plan. Comm'n,* 759 F.Supp. 908, 917 (D.D.C. 1991). This appeal followed.

ANALYSIS

■ Without expressing any views on the District Court's analysis, we need not reach today the issue of whether Planning Commission review of proposed amendments to the Comprehensive Plan under 40 U.S.C. § 71a triggers the § 106 process. Instead, we are convinced that the possible adverse effects created by the Park amendment were considered to the satisfaction of the NHPA when the District purchased McMillan Park from the federal government. Since implementation of the Park amendment entails no new, unconsidered elements, the Planning Commission's review of the amendment could not constitute an "undertaking," and no NHPA obligations attach.

■ In determining if the Planning Commission's action comprised an "undertaking," we look to the Advisory Council's regulations implementing the NHPA, promulgated under authority granted by Congress, 16 U.S.C. § 470s. Though perhaps not an administrative agency in the sense contemplated by *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (remarking on the "considerable weight [that] should be accorded to an executive department's construction of a statutory scheme

it is entrusted to administer"), we nevertheless believe the Advisory Council regulations command substantial judicial deference. In an analogous situation, the Supreme Court in *Andrus v. Sierra Club,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), explained that regulations issued by the Council on Environmental Quality interpreting the National Environmental Policy Act ("NEPA") were entitled to "substantial deference" because the "Council was created by NEPA, and charged in that statute with the responsibility 'to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in ... this Act ..., and to make recommendations to the President with respect thereto.'" *Id.* at 358, 99 S.Ct. at 2341 (citations omitted). Similarly, the Advisory Council was created by the NHPA, 16 U.S.C. § 470i, and charged in that Act with the responsibility to "advise the President and the Congress on matters relating to historic preservation," and to "review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this subchapter." *Id.* § 470j(a)(1) & (6). Given the Supreme Court's reasoning in *Andrus,* we see no basis for extending the Advisory Council's NHPA regulations any less deference than is traditionally afforded the NEPA regulations of the Council on Environmental Quality.

■ As defined by the Advisory Council regulations, an "undertaking" includes "new and continuing projects, activities, or programs and *any of their elements not previously considered under section 106.*" 36 C.F.R. § 800.2(*o*) (emphasis added). The necessary implication of this definition is that a project in which all the elements have been "previously considered under section 106" does not comprise an "undertaking." We find this definition entirely reasonable, and observe that it comports with a logical application of the NHPA; for if a project has previously satisfied the § 106 process, then nothing would be gained by further review if there are no new, unconsidered elements presented by the project.

Applying this understanding of "undertaking," we find that the Advisory Council previously considered all the elements presented by the Park amendment at the time the District purchased the Park from the GSA. When the GSA made the property available, it specified that the range of possible uses included commercial and residential development, GSA Notice of availability of excess real property, DC-P-12 (March 14, 1986), *reprinted in* J.A. 118–19, and it rejected a suggestion that the Park be used solely for recreation and open space. Letter from B.C. Maltby, GSA to Reginald Griffith, Planning Commission (May 21, 1986), *reprinted in* J.A. 126. Likewise, the D.C. government made clear its intention to use the site for recreational space, low and moderate income housing, and commercial development. Johnson Letter, *reprinted in* J.A. 129.

Shortly after the Johnson Letter, the Advisory Council reminded the GSA about its responsibilities under the NHPA regarding the proposed sale of the Park. Letter from Don Klima, Advisory Council, to B.C. Maltby, GSA (Sept. 29, 1986), *reprinted in* J.A. 131. As detailed above, the GSA submitted that if it emplaced in the District's deed the eight restrictive covenants recommended by the Advisory Council, then the sale would have no adverse effects on the historic resources at the Park and would therefore comply with the NHPA. Letter from Patricia Bailey, GSA, to Don Klima, Advisory Council (Feb. 27, 1987), *reprinted in* J.A. 139 (citing 36 C.F.R. § 800.9(c)(3), which provides that an undertaking involving the sale of property may be found to have no "adverse effect" if "adequate restrictions or conditions are included to ensure preservation of the property's significant historic features.").

These covenants, the effectiveness of which no party contests, nearly duplicate the § 106 process by providing extensive consultation rights for the D.C. historic preservation officer before any development may take place at the Park and by requiring the Advisory Council to mediate

disputes concerning effects on historic resources. Responding to the GSA's submission, the Advisory Council concurred that, by including the restrictive covenants, the "requirements of Section 106 of the [NHPA] and the Council's regulations have been met for this project." Letter from Don Klima, Advisory Council, to Patricia Bailey, GSA (March 25, 1987), *reprinted in* J.A. 141.

From this sequence of events and the protections obtained in the restrictive covenants, we believe the Advisory Council had a full opportunity to review the proposed use of the Park for commercial development, and satisfied itself that a change in the Park's use-designation could be achieved consistent with the strictures of the NHPA through inclusion of the protective covenants. We therefore fail to see why the Park amendment, which does no more than codify the change in the Park's use-designation in the manner contemplated by the Advisory Council at the time of the sale, demands additional § 106 review. The Park amendment does not specify how the land will be developed or what structures may be placed there, nor does it limit in any way the operation of the restrictive covenants contained in the District's deed to the Park. Moreover, this is not a case where the GSA sold the property with covenants predicated on a recreational use of the Park and the Planning Commission was then presented with an amendment allowing commercial development. Instead, the Park amendment adds no new element previously unconsidered under the § 106 process, and we therefore find that it did not constitute an "undertaking" and could not obligate the Planning Commission to comply with the § 106 process.

We do not say that an agency's compliance with the § 106 process for a project necessarily satisfies all future obligations that it or other federal agencies may have to comply with the NHPA regarding the same project. As discussed in *Vieux Carre Property Owners v. Brown*, 948 F.2d 1436, 1444–45 (5th Cir.1991), there is a line of cases suggesting that whenever a federal agency has approval authority over a continuing project and has the power to

modify the project to mitigate any adverse impacts on historic resources, then the § 106 process may apply. *Id.* at 1445 n. 27 (citing cases so holding). However, we find these cases inapposite, since they all involved on-going projects, funded or approved by a single federal agency, that had never been subjected to the § 106 process or received Advisory Council approval. *See Vieux Carre*, 948 F.2d at 1439–40 (relating that the United States Army Corps of Engineers did not employ the § 106 process when approving an applicant's project under a nationwide permit); *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 279 (3d Cir.1983) ("It is undisputed that [the federal agency] did not at any time take into account the effect of the [project] on [a historic resource], or afford the Advisory Council ... a reasonable opportunity to comment on the project."); and *Waterbury Action to Conserve Our Heritage, Inc. v. Harris*, 603 F.2d 310, 315 (2d Cir.) (noting that Advisory Council and State Historic Preservation Officer had not been consulted concerning a federally-funded project), *cert. denied*, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979). Where, as here, a project has been found by the Advisory Council to comply fully with the § 106 process, we will heed 36 C.F.R. § 800.2(*o*) and find that no undertaking occurs when that same project, with no new, unreviewed elements, comes before a second federal agency.

■ Finally, we wish to dispel any thought that we are disposing of this case under 36 C.F.R. § 800.5(b), which allows agencies to satisfy the § 106 process if they can show that their project will have no adverse effect on historic resources. As the District Court properly found, findings of no adverse effect must be documented and submitted to a state historic preservation officer for review. *See McMillan Park*, 759 F.Supp. at 914. The Planning Commission never prepared a finding of no adverse effect, and could therefore not avail itself of this process. However, an agency need not satisfy the § 106 process at all, let alone § 800.5(b), unless it is engaged in an undertaking. *Lee*, 877 F.2d at

1056. And we find that the Planning Commission's review of the Park amendment did not, under the circumstances before us today, constitute an undertaking.

CONCLUSION

For the reasons discussed above, we find that the Planning Commission's consideration of the Park amendment under 40 U.S.C. § 71a did not constitute an "undertaking" under the NHPA given the prior review of this project by the Advisory Council. Accordingly, the decision of the District Court below is

*Reversed.*

RANDOLPH, Circuit Judge, concurring:

The majority holds that under the Advisory Council's regulations, the issues presented by the plan amendments were "previously considered" when the GSA sold the property to the District, and thus the National Capital Planning Commission was not required to perform a new section 106 review. 36 C.F.R. § 800.2(*o*). This may be a reasonable view of things, but the Advisory Council did not see it that way. It specifically informed the Planning Commission that section 106 applied to the Commission's consideration of the District's plan amendments, and that a separate section 106 review would not duplicate the previous one done by GSA. Letter from John Fowler to Reginald Griffith (Mar. 22, 1990); Letter from John Fowler to Reginald Griffith (July 20, 1990).

We normally defer to an agency's interpretation of its own regulations, unless it is plainly wrong. *See, e.g., General Carbon Co. v. Occupational Safety & Health Review Comm'n*, 860 F.2d 479, 483 (D.C.Cir. 1988). The Council may have been plainly wrong about what its regulations meant. The majority suggests as much. I write separately because I believe that regardless of whether the Advisory Council misread its own regulations, the National Historic Preservation Act does not authorize the Council to inject itself into local affairs.

The Planning Commission's review of the District's amendments to the plan, which is claimed to trigger the duty to consult with the Advisory Council, is simply too tangential to make those amendments "federal undertakings" under section 106. The primary decisionmaker in this scheme is the District of Columbia. The District determines the entire content of the amendments. The Planning Commission can only veto them; it cannot force the District to adopt any changes (although it can suggest them). The District's amendments encompass only the District's portions of the Comprehensive Plan. The Commission merely reviews these amendments to see if there is a negative impact on the federal portion of the Plan, the "Federal Establishment." *See generally* 40 U.S.C. § 71a.

This arrangement resembles the one in *District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir.1980). There, the State of Maryland issued pollution discharge permits under the Clean Water Act, subject to veto by the Environmental Protection Agency. 33 U.S.C. § 1342. The court held that EPA's refusal to veto a particular permit did not amount to a "major federal action" under the National Environmental Policy Act. *Schramm*, 631 F.2d at 862. Because of the operational similarity between the two statutes, courts generally treat "major federal actions" under NEPA as closely analogous to "federal undertakings" under the NHPA. *E.g., Ringsred v. City of Duluth*, 828 F.2d 1305, 1309 (8th Cir.1987). Just as EPA's oversight did not turn Maryland's permits into "federal" ones, the Planning Commission's oversight did not transform the District's amendments into federal amendments. The District is not just performing a delegated federal function, as Maryland was in *Schramm*, and these are not just permits. The plan amendments at issue here are laws of the District of Columbia. They are submitted by the Mayor, passed by the D.C. Council (40 U.S.C. § 71a(c)), and subject to review by Congress under the Home Rule Act (D.C.CODE § 1–233(c)). The Planning Commission's incidental involvement in that process is not enough to make "federal undertakings" out of these local enactments. Furthermore, interpreting the NHPA to apply to the Commission's review of District amendments would be inconsistent with the notion of "home rule." It

would allow the federal Advisory Council to become involved in local land use planning. Yet the Advisory Council has no authority with respect to state enactments, or with respect to D.C. Council enactments. 16 U.S.C. §§ 470f & 470w; *Lee v. Thornburgh,* 877 F.2d 1053, 1056 (D.C.Cir.1989). Congress naturally retains special interests in the capital. This is why the Planning Commission has the duty to ensure that the District's amendments do not adversely affect the Federal Establishment. But if the Advisory Council can put its foot in the door whenever the Planning Commission performs this duty, the Council will wind up regulating what are essentially local zoning laws. Given the relationship between the District government and the Commission, I would hold that Commission review cannot be used as a basis for allowing the Advisory Council to do in the District what it cannot do in the states: have a say in local legislation.