# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 8, 2005        Decided September 26, 2006

No. 05-1008

CTIA - THE WIRELESS ASSOCIATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

---

On Petition for Review of an Order of the
Federal Communications Commission

---

*Donald B. Verrilli, Jr.* argued the cause for petitioner. With him on the briefs were *Ian H. Gershengorn* and *Michael F. Altschul*.

*C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *James C. Kilbourne* and *Todd S. Kim*, Attorneys, U.S. Department of Justice, and *Samuel L. Feder*, General Counsel, *Daniel M. Armstrong*, Associate General Counsel, and *Richard K. Welch*, Counsel, Federal Communications Commission. *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, entered appearances.

Before: TATEL, GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: CTIA–The Wireless Association ("CTIA") challenges an order of the Federal Communications Commission (1) determining that the construction of wireless communications towers is an "undertaking" subject to section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, and (2) deferring to a determination by the Advisory Council on Historic Preservation (the "Council") that section 106 protects not only those properties formally deemed eligible for listing in the National Register of Historic Places (the "Register"), but also those that simply meet the criteria for listing. Because we conclude the FCC did not err, we deny the petition for review.

## I.

Congress enacted the National Historic Preservation Act ("NHPA" or the "Act") in 1966 to "foster conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony." 16 U.S.C. § 470-1(1). Section 106 of the Act requires federal agencies to "take into account" the effects of their "undertaking[s]" on historic properties "included" or "eligible for inclusion" in the Register. *Id.* § 470f.[1] In doing so, the Act does "not require [a federal

---

[1] Section 106 of the Act provides in full:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted *undertaking* in any State and the head of any Federal department or independent agency having authority to license any *undertaking* shall, prior to the approval of the expenditure of any Federal funds on the *undertaking* or prior to the issuance of any license, as the case may be, take into account the effect of the *undertaking* on any district,

agency] to engage in any particular preservation activities; rather, Section 106 only requires that the [agency] consult the [State Historic Preservation Office] and the [Advisory Council on Historic Preservation] and consider the impacts of its undertaking." *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000).

The Council is an independent agency created by the NHPA, with twenty members drawn from the public and private sectors and a professional staff trained in historic preservation. *See* 16 U.S.C. § 470i(a). The NHPA directs the Council "to promulgate such rules and regulations as it deems necessary to govern the implementation of [section 106] in its entirety." *Id.* § 470s. Using this authority, the Council created what it calls the "section 106 process"—a process that provides "how Federal agencies meet [their] statutory responsibilities" under section 106. 36 C.F.R. § 800.1(a). The section 106 process requires agencies to identify undertakings that might affect historic properties, *id*. § 800.3, identify potentially affected historic properties, *id*. § 800.4, assess the potential adverse effects of their actions on those properties, *id*. § 800.5, and seek ways to "avoid, minimize or mitigate" those effects, *id.* §§ 800.1, 800.6. Agencies "must complete the section 106 process prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license." *Id*. § 800.1(c) (quotation marks omitted).

---

site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such *undertaking*.

16 U.S.C. § 470f (emphasis added).

As an alternative, the Council's regulations provide that agencies "may develop procedures to implement section 106 and substitute them [for the standard section 106 process] . . . if they are consistent with the Council's regulations," *id.* § 800.14(a), a determination the Council itself makes, *id.* § 800.14(a)(2). Agencies and the Council may also "negotiate a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *Id.* § 800.14(b). Such programmatic agreements are frequently used for undertakings whose effects are "similar or repetitive" or "cannot be fully determined prior to approval" of the undertaking. *Id.* § 800.14(b)(1).

Negotiation of a programmatic agreement requires "consultation . . . as appropriate" with "[State or Tribal Historic Preservation Offices ("SHPOs" or "THPOs")], the National Conference of State Historic Preservation Officers ("NCSHPO"), Indian tribes and Native Hawaiian organizations, other Federal agencies, and members of the public." *Id.* § 800.14(b)(2)(I). Programmatic agreements "take effect when executed by the Council, the agency official and the appropriate SHPOs/THPOs when the programmatic agreement concerns a specific region or the president of NCSHPO when NCSHPO has participated in the consultation." *Id.* § 800.14(b)(2)(iii). A programmatic agreement binds the agency and "satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until it expires or is terminated by the agency." *Id.* After being executed by the parties, the agreement has no legal force, however, until after the agency has provided public notice of its terms and allowed for public comment. *Id.* § 800.14(b)(2)(iv). Only then may the agency issue an order that makes the terms of the agreement binding.

This case involves a programmatic agreement negotiated by the Federal Communications Commission ("FCC" or "Commission"), the Council, and the NCSHPO regarding wireless communications towers. Prior to execution of this agreement, wireless communication tower construction was subject to the standard section 106 process established by the Council. In August 2000, the FCC convened a working group to develop a programmatic agreement for wireless communications towers. This working group included the FCC, the Council, representatives of the wireless communications industry (including CTIA), and individuals and organizations from the historic preservation community. By June 2003, the working group had drafted a Nationwide Programmatic Agreement ("NPA") regarding tower construction. The NPA

> [a]dopt[ed] categories of undertakings that are excluded from the Section 106 process . . . [;] [o]utline[d] procedures regarding public participation; [and] [a]dopt[ed] procedures regarding the identification and evaluation of historic properties and the assessment of effects, including: (1) guidelines for establishing the area of potential effects, (2) streamlined procedures for identifying potentially eligible properties for purposes of the Nationwide Agreement, (3) standards governing the conduct of archeological surveys, (4) a definition of visual adverse effects, and (5) standards for the use of qualified experts.

*Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process*, 20 F.C.C.R. 1073, 1075 ¶ 2 (2004) (the "*NPA Order*"). The NPA also "[e]stablish[ed] procedures for SHPO/THPO and Commission review" of proposed tower construction. *Id.*

After the NPA was drafted, the FCC issued a notice of

proposed rulemaking seeking public comment on the proposed agreement and a draft amendment to its regulations that would incorporate the NPA into the Commission's rules. *See Notice of Proposed Rulemaking, Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process*, 18 F.C.C.R. 11664 (2003) ("*Notice of Proposed Rulemaking*" or "*NPRM*") (proposing to amend 47 C.F.R. § 1.1307(a)(4)). On January 4, 2005, following the notice and comment period, the FCC issued the *NPA Order*, in which the FCC adopted its proposed changes. *See NPA Order*, 20 F.C.C.R. at 1074 ¶ 1. In the *NPA Order*, the FCC concluded that construction of a wireless communications tower constitutes an "undertaking" subject to section 106 of the NHPA. *Id.* at 1082-84 ¶¶ 24-28. In addition, the FCC deferred to the Council's interpretation of the term "eligible for inclusion" as including properties formally determined eligible for listing on the Register *and* properties that meet the criteria for listing but have not yet received a formal determination. *Id.* at 1117 ¶ 121. CTIA filed a petition for review challenging those two aspects of the *NPA Order* and invoking this Court's jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. §§ 2342, 2344.

## II.

Even where the "parties assure us that we have jurisdiction over [a] case, we have an independent obligation to be certain." *Midwest Indep. Transmission Sys. Operator, Inc. v. FERC*, 388 F.3d 903, 908 (D.C. Cir. 2004) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). Section 2344 of Title 28, United States Code, allows "[a]ny party aggrieved by the [FCC's] final order . . . within 60 days after its entry" to "file a petition to review," with respect to "a final order reviewable under this chapter." *Id.* Although neither CTIA nor the FCC challenged our jurisdiction in their briefs, we questioned at oral argument whether CTIA's petition for review was timely with

respect to one of its challenges.

CTIA filed its petition for review within 60 days of the FCC's final order implementing the Nationwide Programmatic Agreement, and seeks to challenge two independent grounds set forth in the *NPA Order* in support of the FCC's conclusion that tower construction is a federal undertaking subject to the NHPA. As we discuss more fully in Section III, first, the *NPA Order* determined that tower construction constitutes a "federal undertaking" under section 106 because of the FCC's registration process, through which the Commission "may assure, prior to construction, that towers do not pose a risk to air safety," 20 F.C.C.R. at 1084 ¶ 27. Second, the *NPA Order* determined that tower construction additionally constitutes a "federal undertaking" because of the FCC's approval process for environmental assessments under [the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347]. 20 F.C.C.R. at 1083 ¶ 26.

Two earlier Commission orders, however, also address the duties of tower owners under the NHPA. In 1990, the Commission "amend[ed] its rules to require environmental review before any applicant proceeds with [tower] construction." *Amendment of Environmental Rules*, 5 F.C.C.R. 2942, 2942 ¶ 4 (1990) ("*1990 Order*"). As part of that amendment, the Commission required tower owners to comply with the NHPA prior to construction so that the Commission could "address[] environmental issues early enough in the licensing process to ensure that it fully meets its obligations under Federal environmental laws." *Id.* at 2943 ¶ 9 & n.16 (citing the NHPA, 16 U.S.C. § 470, *et seq.*). The *1990 Order* never explicitly addresses whether tower construction is a federal undertaking under section 106 of the NHPA. Instead, the *Order* reasons that "any delay in construction that results from requiring an applicant to undergo environmental processing prior to

construction, rather than at the licensing stage, is more than offset by the *public interest* benefits of ensuring, in compliance with Federal environmental statutes, that no potentially irreversible harm to the environment occurs." *Id.* at 2943 ¶ 11 (emphasis added). Thus, the *1990 Order* determines that requiring compliance with the Commission's environmental regulations prior to tower construction is in the public interest.

In 1995, the Commission explicitly concluded that "registering a structure," *i.e.*, its tower registration process, "constitutes a . . . 'federal undertaking'" under the NHPA. *Streamlining the Commission's Antenna Structure Clearance Procedure*, 11 F.C.C.R. 4272, 4289 ¶ 41 & n.60 (1995) ("*1995 Order*").[2] Unlike the order we now review, the *1995 Order* contains no analysis of relevant statutes and regulations in support of that conclusion. *See id.*

The parties did not address in their briefs whether CTIA's petition is timely in light of these two orders. After questioning jurisdiction at oral argument, we ordered supplemental briefing. Both parties now quarrel over application of the "reopening doctrine." The reopening doctrine, "well-established in this circuit," is "an exception to statutory limits on the time for seeking review of an agency decision." *Nat'l Ass'n of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998) (quoting *United Transp. Union-Ill. Legislative Bd. v. Surface Transp. Bd.*, 132 F.3d 71, 75-76 (D.C.

---

[2]Although the Commission spoke of "registering a structure" as "constitut[ing] a . . . federal undertaking," *1995 Order*, 11 F.C.C.R. at 4289 ¶ 41, we have previously noted that "federal authority to fund or to license a project can render *the project* an undertaking, but *the decision* of the funding or licensing agency is not itself an undertaking," *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 754 (D.C. Cir. 1995) (emphasis added).

Cir. 1998)) (alterations and quotation marks omitted). The doctrine "arise[s] . . . where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." *Id.* On one end of the spectrum, "[w]e have said that when the later proceeding explicitly or implicitly shows that the agency actually reconsidered the rule, the matter has been reopened and the time period for seeking judicial review begins anew." *Id.* (citing *Public Citizen v. NRC*, 901 F.2d 147, 150 (D.C. Cir. 1990)). "'The general principle is that if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable.'" *Id.* (quoting *Public Citizen*, 901 F.2d at 150 (quoting *Assoc. of Am. R.Rs. v. ICC*, 846 F.2d 1465, 1473 (D.C. Cir.1988))) (alterations omitted); *see PanAmSat Corp. v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999) (same).

On the other end of the spectrum, we have concluded that an agency does not reopen a rulemaking or policy determination "merely [by] respond[ing] to an unsolicited comment by reaffirming its prior position." *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) (citing *Massachusetts v. ICC*, 893 F.2d 1368, 1372 (D.C. Cir. 1990)). "Nor does an agency reopen an issue by responding to a comment that addresses a settled aspect of some matter, even if the agency had solicited comments on unsettled aspects of the same matter." *Kennecott*, 88 F.3d at 1213.

In determining "whether an agency reconsidered a previously decided matter," we "'must look to the entire context of the rulemaking including all relevant proposals and reactions of the agency.'" *Reversionary Property Owners*, 158 F.3d at 141 (quoting *Public Citizen*, 901 F.2d at 150) (alterations omitted). We have, through numerous decisions, summarized several factors that will demonstrate reopening in this Circuit. *See id.* at

142-43; *Kennecott*, 88 F.3d at 1213-15; *Public Citizen*, 901 F.2d at 150; *State of Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988). We need not, and do not, revisit the weight given to various factors in distinguishing between reopening an issue and "mere[ly] . . . repeating old reasons for an old policy in response to unsolicited comments." *Reversionary Property Owners*, 158 F.3d at 145. For in this case, the FCC's treatment in the *NPA Order* of whether tower construction is a federal undertaking falls comfortably on the reopening side of the spectrum.

As noted, the *1990 Order* determined that requiring tower owners to comply with the NHPA prior to construction would produce "public interest benefits" by "ensuring, in compliance with Federal environmental statutes, that no potentially irreversible harm to the environment occurs," 5 F.C.C.R. at 2943 ¶ 11, and the *1995 Order* concluded that the tower registration process "constitutes a . . . 'federal undertaking'" under the NHPA. 11 F.C.C.R. at 4289 ¶ 41 & n.60. The Commission's *Notice of Proposed Rulemaking* for the *NPA Order* did not explicitly state that the Commission would not reconsider these conclusions. Instead, after identifying several specific issues for review, including whether the NPA should provide for "*exclusion* of certain Undertakings from routine Section 106 review," the *NPRM* requested comments on "any other issues related to the draft Nationwide Agreement." 18 F.C.C.R. at 11665 ¶ 2 (emphasis added).

This paragraph comes after a previous footnote indicating that the NPA contained an "illustrative list of Commission activities in relation to which Undertakings covered by the draft [NPA] may occur," which was attached to the *NPRM*. *Id.* at n.6. That "illustrative list" proposed that tower construction, to the extent covered by the FCC's registration process, would constitute an undertaking under the NPA, *id.* at 11724, as the *1995 Order* previously concluded with respect to the general

section 106 process. The draft NPA further noted that applicants "are required to prepare, and the Commission is required to independently review and approve, a pre-construction Environmental Assessment ("EA") in cases where a proposed tower or antenna may significantly affect the environment." *Id.* at 11671.

Although a general invitation to comment, by itself, may not "thr[o]w the rulemaking open to any possible changes that any member of the public might conjure up with the result that summary denial of such changes becomes reviewable by the courts," *Reversionary Property Owners*, 158 F.3d at 145, "[a]mbiguity in an NPRM may . . . tilt toward a finding that the issue has been reopened," *id.* at 142. "[C]onsider[ing] the cited language in the NPRM in the 'entire context of the rulemaking,'" *id.* at 144 (quoting *Public Citizen*, 901 F.2d at 150), the Commission's proceedings are fairly read as reopening the issue of why tower constructions constitute federal undertakings subject to the NHPA and the new NPA.

The *NPA Order* began its discussion of this issue by stating that the Commission "decline[d] to revisit, as beyond the scope of this proceeding, the Commission's existing interpretation that the construction of antennas and support facilities is a federal undertaking under the NHPA." 20 F.C.C.R. at 1079 ¶ 16; *see also id.* at 1075 ¶ 2. The Commission then went on to clarify that its "*Notice [of Proposed Rulemaking]* did not seek comment on the question whether the Commission should, *assuming that it possesses statutory authority to do so*, continue our current treatment of tower construction as an 'undertaking' for purposes of the NHPA" and that "[t]herefore, [the Commission] decline[d] to revisit *that public-interest question* in this docket." *Id.* at 1083 ¶ 24. This clarification appears to suggest that the Commission declined to revisit the question whether it is in the public interest to require historic properties to be taken into consideration prior

to tower construction—the subject of the *1990 Order*. The Commission made no statement that it declined to reconsider whether it had statutory authority to treat tower construction as an undertaking, and in fact proceeded to address this issue. *See NPA Order*, 20 F.C.C.R. at 1083 ¶ 26 (explaining that the Commission "expressly retained a limited approval authority for all tower construction to the extent necessary to ensure compliance with federal environmental statutes"); *id.* at 1084 ¶ 27 (addressing why tower registration "constitut[es] an approval process within the Commission's [47 U.S.C. §] 303(q) authority"). Even assuming *arguendo* the Commission could foreclose judicial review of a new reason given for an old conclusion by stating that it is not reopening an issue, the Commission did not explicitly do so here.

Finally, the *NPA Order* indisputably offers two new justifications not found in the *1990 Order* or *1995 Order*. In fact, these two justifications offer the Commission's first explicit rationales for concluding that tower construction is an undertaking, explaining that the FCC's tower registration process and its approval authority under NEPA constitute undertakings. Looking to "'the entire context of the rulemaking,'" *Reversionary Property Owners*, 158 F.3d at 141 (quoting *Public Citizen*, 901 F.2d at 150), the FCC reopened the undertaking issue CTIA challenges where the Commission's NPRM was ambiguous, its order did not foreclose reopening the precise matters at issue, and those matters constituted the Commission's first legal rationales for its action to date. Thus, we have jurisdiction to hear CTIA's challenge.

## III.

CTIA urges that the *NPA Order* was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). CTIA contends that the FCC erred in

concluding that (1) tower construction constitutes a federal undertaking and (2) properties "eligible for inclusion" under section 106, 16 U.S.C. § 470f, include not only proprieties formally designated as such by the Secretary of the Interior, but also properties that meet the criteria outlined in the statute and implementing regulations. We find no error.

A. *The FCC's conclusion that tower construction constitutes an "undertaking."*

Section 106 of the NHPA requires federal agencies to "take into account the effect of the *undertaking*." *Id*. § 470f (emphasis added). Thus, whether the protections of section 106 are triggered turns on whether there has been an "undertaking." *Id.* The Act defines an undertaking as:

a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including—

(A) those carried out by or on behalf of the agency;

(B) those carried out with Federal financial assistance;

(C) those requiring a Federal *permit*[,] *license, or approval*; and

(D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

16 U.S.C. § 470w(7) (emphasis added).

In *Sheridan Kalorama Historical Ass'n v. Christopher*, we noted that "[u]pon a first reading, the . . . definition seems

actually to confine the notion of an 'undertaking' to a project '*funded* in whole or in part under the direct or indirect jurisdiction of a federal agency,' and thus by omission to exclude a federally licensed project from the coverage of the statute." 49 F.3d 750, 755 (D.C. Cir. 1995) (emphasis added).  We rejected that reading, however, because it "would deprive the references to licensing in § 106 of any practical effect." *Id.*  We thus held that "Congress intended to expand the definition of an 'undertaking'—formerly limited to federally funded or licensed projects—to include projects requiring a federal 'permit' or merely federal 'approval.'" *Id.*  Thus, under *Sheridan Kalorama*, a "project, activity, or program," 16 U.S.C. § 470w(7), does not require federal funding to be an "undertaking" under section 106 of the NHPA.  *See id*.  Instead, only a "Federal permit, license or approval" is required.  *Id.* § 470w(7)(C).  Because the *NPA Order* only focuses on whether "Federal . . . *approval*," *id.* § 470w(7)(C) (emphasis added), is required for tower construction, *NPA Order*, 20 F.C.C.R. at 1082-84 ¶¶ 24-28, our task is relatively straightforward.[3]  We must determine whether the FCC acted arbitrarily or capriciously in concluding that tower construction requires "Federal . . . approval."  16 U.S.C. § 470w(7)(C).

In the *NPA Order*, as we have noted, the FCC concluded

---

[3] CTIA also argues that "the FCC cannot justify its imposition of NHPA obligations on the ground that the requisite federal licensing occurs when the FCC issues the initial license that allows carriers to provide wireless services."  Petitioner's Br. at 30.  The FCC does not rely upon this justification in the *NPA Order*.  20 F.C.C.R. at 1082-84 ¶¶ 24-28.  Because "we may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review," we do not address this contention.  *Williams Gas Processing-Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) (quotation marks and citation omitted).

that tower construction requires federal approval because (1) the Commission's tower registration process "may be viewed as effectively constituting an approval process within the Commission's section 303(q) authority," 20 F.C.C.R. at 1084 ¶ 27, and (2) a "limited approval authority" retained by the FCC with respect to NEPA additionally constitutes federal approval, *id*. at 1083-84 ¶ 26.

With respect to the first ground, discussing its tower registration regulations implemented pursuant to section 303(q) of the Communications Act of 1934, *see NPA Order*, 20 F.C.C.R. at 1084 ¶ 27 n.53 (citing 47 U.S.C. § 303(q); 47 C.F.R. §§ 17.4, 17.7), the FCC concluded that its tower "registration process provides a permissible means by which the Commission may assure, prior to construction, that towers do not pose a risk to air safety," *id.* at 1084 ¶ 27. Section 17.7 of the Commission's regulations requires a party seeking to build a tower to consult with the Federal Aviation Administration ("FAA") if the proposed tower meets certain height and location criteria. 47 C.F.R. § 17.7. An owner of such a proposed tower must then "register the structure with the Commission." 47 C.F.R. § 17.4(a). Subject to certain exceptions, an owner "must submit a valid FAA determination of 'no hazard'" as part of the registration request. *Id.* § 17.4(b). If the owner does not or cannot submit a "no hazard" determination, "processing of the registration may be delayed or disapproved." *Id.* § 17.4(d).

The *NPA Order* concluded that the FCC's having conditioned its approval in the regulations upon receiving "the requisite FAA clearance" amounts to "an approval process." *NPA Order*, 20 F.C.C.R. at 1084 ¶ 27. This conclusion built upon an earlier statement in the *1995 Order*, albeit addressing the Commission's tower registration process generally and not speaking to the NHPA. There, the FCC noted that "[p]roposal [sic] antenna structures that are determined by the FAA to

present a potential hazard to air navigation must be lighted during construction" and that the Commission's "registration process [is] the federal government's only method of requiring such safety lighting, as the FAA does not have statutory authority to mandate the painting or lighting of antenna structures." 11 F.C.C.R. at 4281 ¶ 20.

CTIA argues this registration process is "wholly ministerial" and thus "do[es] not create federal undertakings." Petitioner's Br. at 26-27. CTIA directs us to a portion of the *1995 Order* indicating that "*upon receipt of the FAA determination for the structure*, the electronic filing capability will enable the owner to register the structure with the Commission and receive a registration number within minutes." 11 F.C.C.R. at 4281-82 ¶ 20 (emphasis added). CTIA argues that because the Commission can make this determination "within minutes," *id.*, it must be a ministerial determination and not truly a process amounting to "Federal . . . approval," 16 U.S.C. § 470w(7)(C), that would make tower construction a federal undertaking, *see* 16 U.S.C. § 470f. CTIA omits from its brief, however, the portion of the *1995 Order* set out with emphasis above: "upon receipt of the FAA determination for the structure." Petitioner's Br. at 27 (discussing 11 F.C.C.R. at 4281-82 ¶ 20). The FCC has chosen, through its registration regulations, to grant approval of a registration if it receives a "no hazard" determination from the FAA. *See* 47 C.F.R. § 17.4(d). If it does not, as we have noted, the FCC's regulations allow the Commission in its discretion to "delay[] or disapprove[]" a registration. *Id.* CTIA never addresses § 17.4(d), but we fail to see how the Commission's approval under that section—"the federal government's only method of requiring . . . safety lighting," *1995 Order*, 11 F.C.C.R. at 4281 ¶ 20—cannot constitute "Federal . . . approval," 16 U.S.C. § 470w(7)(C). Thus, the *NPA Order* was neither arbitrary nor capricious, *see* 5 U.S.C. § 706(2)(A), in determining that tower construction, to the extent covered by the

FCC's registration process, constitutes a federal undertaking subject to section 106 of the NHPA.[4]

As a second ground for concluding that tower construction requires "Federal . . approval," 16 U.S.C. § 470w(7), the *NPA Order* concluded that the FCC has "expressly retained a limited approval authority for all tower construction to the extent necessary to ensure compliance with federal environmental statutes." 20 F.C.C.R. at 1083-84 ¶ 26. Specifically, among other things, the FCC requires that owners submit for its approval, prior to tower construction, environmental assessments called for by NEPA. *See NPA Order*, 20 F.C.C.R. at 1083-84 ¶ 26. Where a facility "may have a significant environmental impact," the FCC's regulations require that an environmental assessment "shall be submitted by the [owner] and *ruled on* by the Commission . . . *prior* to the initiation of construction of the facility." 47 C.F.R. § 1.1312(b) (emphasis added); *see NPA Order*, 20 F.C.C.R. at 1083 n.52.

The environmental assessment "is a document [that] explain[s] the environmental consequences of the proposal and set[s] forth sufficient analysis for . . . the Commission to reach

---

[4] Both parties appear to agree that this ground only applies to a subset of towers subject to the Commission's tower registration process. CTIA argues these registration requirements "do[] not . . . apply to the vast majority of towers" because they only apply to towers meeting certain requirements. Petitioner's Br. at 26. The *NPA Order* appears to recognize as much: "the Commission has chosen to implement rules requiring that towers *meeting certain height and location criteria* be registered with the Commission prior to construction." *NPA Order*, 20 F.C.C.R. at 1084 ¶ 27 (emphasis added). Before us, the Commission does not appear to dispute that tower construction constitutes a federal undertaking "at least," *i.e.*, only, "as to the towers for which registration is required." Respondent's Br. at 30-31.

a determination that the proposal will or will not have a significant environmental effect." 47 C.F.R. § 1.1308(b). Where a proposal, such as a proposed wireless communications tower, has a "significant environmental effect," *id*., the FCC is required by NEPA to consult with expert Federal agencies and, following such consultation, to prepare a detailed environmental impact statement ("EIS"). *See* 42 U.S.C. § 4332(2)(c); 47 C.F.R. §§ 1.1308, 1.1315, 1.1317.

By requiring a ruling on each environmental assessment *prior* to tower construction, the FCC has retained authority over tower construction in order to ensure that it complies with NEPA. Whatever else "approval" may mean, we see no basis for CTIA's suggestion that the FCC's retention of authority to "rule[] on," 47 C.F.R. § 1.1312(b), a party's submission under NEPA cannot constitute "approval," 16 U.S.C. § 470w(7)(C). We conclude that the *NPA Order* was neither arbitrary nor capricious, *see* 5 U.S.C. § 706(2)(A), in determining that the FCC's approval authority under NEPA makes tower construction an undertaking.

B. *The FCC's deference to the Council's interpretation of "eligible for inclusion."*

Section 106 requires agencies to consider the potential impacts of their undertakings on properties that are "included in or *eligible for inclusion* in the National Register." 16 U.S.C. § 470f (emphasis added). Both CTIA and the FCC agree that properties included in the Register must be considered in applying section 106. At issue here is what properties must be considered because they are "eligible for inclusion." *Id.* In its regulations, the Council has interpreted "eligible for inclusion," *id.*, to include "both properties formally determined as such in accordance with regulations of the Secretary of the Interior and all other properties that meet the National Register criteria." 36

C.F.R. § 800.16(1)(2). In other words, some properties have been "formally determined" as eligible, and others may, in fact, meet the criteria for eligibility, but have not yet been "formally determined" eligible. In the *NPA Order*, the FCC deferred to the Council's "clearly stated interpretation of its own governing statute," *NPA Order*, 20 F.C.C.R. at 1117 ¶ 121. Although not explicitly invoking a standard of review under which we might reverse the FCC's decision to defer to the Council, CTIA contends that "deference to the [Council] cannot save the Commission's order." Petitioner's Br. at 39.

Congress has granted the Council authority "to promulgate such rules and regulations as it deems necessary to govern the implementation of section 470f of this title[, section 106 of the Act,] in its entirety." 16 U.S.C. § 470s. In *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979), the Supreme Court determined that regulations promulgated by the Council on Environmental Quality interpreting NEPA were entitled to "substantial deference" because the "Council [on Environmental Quality] was created by NEPA, and charged in that statute with the responsibility 'to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in . . . this Act . . . , and to make recommendations to the President with respect thereto.'" *Id.* at 358 (citation omitted). We applied that holding to the National Historic Preservation Act and the Advisory Council on Historic Preservation in *McMillan Park Commission v. National Capital Planning Commission*, 968 F.2d 1283, 1287-88 (D.C. Cir. 1992).

In *McMillan Park*, we explained that, as in *Andrus* with respect to the Council on Environmental Quality, the Advisory Council on Historic Preservation

> was created by the NHPA, 16 U.S.C. § 470i, and charged in that Act with the responsibility to "advise

the President and the Congress on matters relating to historic preservation," and to "review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this subchapter." *Id.* § 470j(a)(1) & (6). Given the Supreme Court's reasoning in *Andrus*, we see no basis for extending the Advisory Council's NHPA regulations any less deference than is traditionally afforded the NEPA regulations of the Council on Environmental Quality.

968 F.2d at 1288. Thus, we concluded in *McMillan Park*, "the Advisory Council regulations command substantial judicial deference." *Id.*

CTIA makes four arguments in attempting to show that the FCC's deference to the Council was unlawful. First, CTIA argues that "it appears that the FCC misconstrued its own authority to adopt in the NPA a definition of ["eligible for inclusion"] that differed from that adopted by the [Council]." Petitioner's Br. at 39.[5] Having reviewed the *NPA Order* in its entirety, we cannot agree with CTIA, however, that the FCC misunderstood—or, as CTIA puts it, "appears" to have misunderstood— its authority in determining whether to defer to the Council's definition of the statutory term "eligible for inclusion," 16 U.S.C. § 470f. The *NPA Order* repeatedly

---

[5] This argument is predicated upon a single statement in the *NPA Order*: "We also note that Section 800.14 of the Council's rules, which authorizes programmatic agreements, discusses alternative procedures to Subpart B of the Council's rules, but the definition of Historic Property is in Subpart C." *NPA Order*, 20 F.C.C.R. at 1117 ¶ 121.

indicates that the Commission saw no ground for departing from the Council's interpretation of a statute it is charged by Congress with implementing. *See NPA Order*, 20 F.C.C.R. at 1116-20 ¶¶ 118-27.

Second, CTIA argues in a sentence that the phrase "eligible for inclusion" in section 106 is "unambiguous," Petitioner's Br. at 41, although it provides no argument in support of that assertion. *See City of Waukesha v. EPA*, 320 F.3d 228, 251 n.22 (D.C. Cir. 2003) ("argument[s] . . . raised in the opening brief only summarily, without explanation or reasoning, . . . [are] waived"). But as the parties' competing arguments show, the phrase "eligible for inclusion" is susceptible to at least the two different readings offered by CTIA and the Council: properties that merely meet eligibility criteria and properties that have been formally designated as such.

Third, CTIA argues that the Council's interpretation of the term "eligible for inclusion" is not entitled to deference because it "appears in multiple provisions of the NHPA, including, most prominently, Section 101," which is subject to interpretation by the Secretary of the Interior. Petitioner's Br. at 41. Although it is generally true that deference may not apply to an agency's interpretation of a statute if Congress has entrusted more than one agency with administering the statute, *see, e.g., Ass'n of Am. Phys. and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 913 (D.C. Cir. 1993) ("we do not defer to an agency's construction of a statute interpreted by more than one agency"), that is not this case. Congress has entrusted one agency with interpreting and administering section 106 of the NHPA: the Council. *See* 16 U.S.C. § 470s (authorizing the Council "to promulgate such rules and regulations as it deems necessary to govern the implementation of [section 106 of the Act] *in its entirety*") (emphasis added). Although the term "eligible for inclusion" may appear in other provisions, Congress has authorized the

Council to administer the provision at issue here: section 106.

Finally, CTIA argues that the Council's interpretation "cannot be squared with the text and structure of the Act, or with the legislative history of Section 106." Petitioner's Br. at 34. In CTIA's view, a property can only be "eligible for inclusion" under the Act, 16 U.S.C. § 470f, if it has been "formally" determined to be eligible by the Secretary of the Interior. Petitioner's Br. at 34. Specifically, CTIA makes several arguments about "the text and structure of the statute," which, in its view, demonstrate that the Council's regulation cannot be reconciled with the Act. *Id*. at 34-39. CTIA then discusses legislative history that it believes to be at odds with the Council's reading. *Id.* at 38.

Although CTIA has not directed us to any of its own comments in which it makes its present arguments to the FCC, several parties raised statutory and legislative history arguments before the Commission. "Courts have long required a party seeking review of agency action to exhaust its administrative remedies before seeking judicial review." *Natural Resources Defense Council, Inc. v. EPA*, 824 F.2d 1146, 1150-51 (D.C. Cir. 1987) (*en banc*). "This court," however, "has excused the exhaustion requirements for a particular issue when . . . the agency has had an opportunity to consider the identical issues presented to the court but which were raised by other parties." *Id.* at 1151 (quotation marks, citations, and alterations omitted). The FCC summarized those arguments, *see NPA Order*, 20 F.C.C.R. at 1116 ¶ 119, but never took a position on them because it chose "not [to] alter the definition of Historic Property used in . . . the Council's rules," *id.* at 1117 ¶ 121 (discussing 36 C.F.R. § 800.16(l), which defines "historic property" and the related term "eligible for inclusion"). Because the FCC "defer[red] to the Council's clearly stated interpretation of its own governing statute," it "concluded that questions regarding

the definition of historic properties are outside the scope of this proceeding and should be addressed, if at all, by the Council." *Id.*

CTIA acknowledges as much in its brief, indicating in a footnote that "[i]n adopting the [Council's] definition of 'eligible for inclusion in the National Register,' the FCC did not independently interpret the statute . . . ." Petitioner's Br. at 40 n.14. CTIA never explains why, in requiring regulated parties to follow the Council's interpretation of section 106, the FCC was required to revisit the Council's interpretation. The FCC did not reach the statutory and legislative arguments pressed by CTIA here because there was no need to do so, in light of its reasonable choice to defer to the Council's interpretation.

Given that *we* must defer under *Andrus* and *McMillan Park* to the Council's reasonable interpretation of the meaning of section 106, we cannot see how it was arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), for the FCC to choose to do so as well. Giving the Council's reading of section 106 the "substantial . . . deference" it is owed, *McMillan Park*, 968 F.2d at 1288; *see Andrus*, 442 U.S. at 358, the Council's interpretation was reasonable. As noted, the Council concluded that "eligible" properties under section 106 include "both properties formally determined as such in accordance with regulations of the Secretary of the Interior *and* all other properties that *meet* the National Register *criteria*." 36 C.F.R. § 800.16(1)(2) (emphasis added). CTIA argues that the latter of these two regulatory definitions of eligible was unreasonable, but it fits comfortably within the common meaning of eligible.

"Eligible" has been defined as "fitted or qualified to be chosen or used." *Webster's Third New International Dictionary of the English Language Unabridged* 736 (1981). Although "fitted or qualified to be chosen or used," *i.e.*, "meet[ing] . . .

criteria," may not be the only possible reading of the statutory term "eligible," it is one possible, reasonable interpretation of that term. We cannot say that the Council's interpretation of "eligible" was unreasonable merely because it was not limited, as CTIA would prefer, to properties formally designated as eligible. CTIA argues that references in other parts of the Act to properties that "may be" eligible, *see, e.g.,* 16 U.S.C. § 470h-2(a)(2)(B), means that Congress could have directed that section 106 look to properties that "may be eligible" instead of properties that are "eligible for inclusion in the National Register," 16 U.S.C. § 470f. Nonetheless, we do not find these other references clear up the ambiguity the parties have identified, and it is the Council, *see* 16 U.S.C. § 470s (charging the Council with "promulgat[ing] such rules and regulations as it deems necessary to govern the implementation of [section 106] in its entirety"), and not CTIA that is charged with interpreting it in the first instance. Thus, CTIA has failed to explain how the FCC acted contrary to law in following the Council's reasonable interpretation of a statute the Council is charged with implementing.

## IV.

For the foregoing reasons, the petition for review is denied.

*So ordered.*